# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

### IN THE MATTER OF:

### E.T. nka E.W.-T.,

### Alleged Dependent Child.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 22 MA 0116, 22 MA 0133**

---

Juvenile Appeal from the
Mahoning County Court of Common Pleas,
Juvenile Division of Mahoning County, Ohio
Case Nos. 2019 JC 00269 JUV

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Christopher P. Lacich,* Roth, Blair*,* 100 East Federal Street, Suite 600*,* Youngstown, Ohio 44511 for (Father)*,* Appellant and

*Atty. Rhonda G. Santha,* 6401 State Route 534, West Farmington, Ohio 44491 for (Mother), Appellant and

*Atty. Ebenezer Appiagyei, Atty. Lori Shells-Simmons,* Mahoning County Children Services, 222 West Federal Street, 2nd Floor, Youngstown, Ohio 44503 for Appellee.

Dated:  February 15, 2023

**Robb, J.**

{¶1}   Appellant Father appeals the October 20, 2022 judgment granting permanent custody of his daughter to the Mahoning County Children Services (the Agency) and terminating Appellant Father's parental rights.  He is the natural father of E.T., born in November of 2017.

{¶2}   The judgment appealed likewise te`rminated E.T.'s mother's parental rights.  Appellant Mother separately appealed, and we consolidated the appeals for opinion purposes only.[1]   Appellant Mother asserts two assigned errors.   She contends she substantially remedied the issues that caused the child's removal from her care, and the trial court failed to address the R.C. 2151.414(D)(2) best interest factors.

{¶3}   Appellant Father raises three assignments of error.  He claims the Agency failed to follow Ohio's Interstate Compact for Placement of Children Adopted.  Appellant Father also asserts he was still pursuing reunification; the trial court's decision is contrary to the evidence; and the court abused its discretion by refusing to continue the trial.

{¶4}   For the following reasons, we find all the assignments of error lack merit and affirm the trial court's decision.

Statement of the Case

{¶5}   On March 6, 2019, the Agency filed its complaint alleging E.T. was a dependent child.  It claimed the child's mother and child resided at a local rescue mission in March of 2016 when Appellant Mother left the child at the shelter for the evening with an inappropriate babysitter.   When Appellant Mother returned, she was extremely intoxicated and unable to care for the child, who was an infant at the time.  The police were called, and Appellant Mother was asked to leave the shelter, which left her and the child homeless.  Appellant Father is named in the complaint as the putative father, and he was sent a copy and notice of the initial adjudication hearing at an address in Wisconsin.  (March 6, 2019 Complaint.)

{¶6}   The March 12, 2019 Magistrate's Order was issued following the initial shelter hearing.   It indicates in part that placement with Appellant Father was not appropriate since he lives in Wisconsin.  (March 12, 2019 Magistrate's Order.)

---

[1] The briefing in Appellant Mother's appeal was delayed by a motion to appoint new counsel, which delayed the release of our judgment in Appellant Father's appeal as well.  App.R. 11.2(C)(1)(5).

**{¶7}** The initial case plan objectives for Appellant Mother included that she secure and maintain safe and stable housing, obtain verifiable income, submit to random drug and alcohol screens, and complete drug, alcohol, and mental health screenings and follow applicable recommendations of each. The goal was for Appellant Mother to demonstrate her ability to meet the basic needs of the child so reunification could occur. The initial case plan also indicated that although Appellant Mother was living in Wisconsin, she wished to work on her case plan goals. In addition to the objectives for Appellant Mother, the initial case plan indicates Appellant Father needed to establish paternity. (April 25, 2019 Magistrate's Order.)

**{¶8}** In May of 2019, the case was before the magistrate and was continued. The corresponding order indicates the Agency's attorney moved to continue the proceeding to perfect service on Appellant Father. It states: "Although Putative Father provided the Agency with the correct address, he did not sign for the United States Certified Mail. * * * The Agency has had contact with Putative Father who resides in Wisconsin with Mother. Arrangements have been made for paternity testing in his locale, while the Minor Child is tested here." The child's adjudication and disposition were again reset to June of 2019. (May 30, 2019 Magistrate's Order.) The matter was again reset to July 23, 2019.

**{¶9}** The Magistrate's Order issued after the July 2019 hearing states in part Appellant Mother was served and was not present. The order also states Appellant Father was served with notice and he was also not present. The hearing was held, and the child was adjudicated a dependent. The order summarizes testimony of an Agency caseworker who communicated with both Appellant Father and Appellant Mother and said neither intend to return to Mahoning County. The caseworker also testified about the Agency's efforts to initiate an Interstate Compact for Placement of Children (ICPC) investigation, but it was rejected because it involved the parents. The child was in the temporary custody of her maternal grandmother at the time of the hearing in Ohio, and the Agency was addressing an alternative permanency plan for legal custody of the child to her maternal grandmother. (July 23, 2019 Magistrate's Order.)

{¶10} Appellant Father was subsequently verified as the child's natural father. This judgment entry also identified Appellant Mother and Appellant Father as residing at the same address in Wisconsin. (August 21, 2019 Judgment.)

{¶11} The August 30, 2019 Semi-annual Review also stated both Appellant Mother and Appellant Father reside in Wisconsin. It stated that both continued to have substance abuse issues, and neither parent had "engaged in services or completed Safety Plan goals." The child remained in her grandmother's care at this time. Her grandmother reported she sporadically heard from Appellant Mother, who told her that Appellant Father "sold their EBT card for drugs." This review also states Appellant Father "is also in Wisconsin and does not wish to receive services. * * * An ICPC was denied by Wisconsin." (August 30, 2019 Semi-annual Review.)

{¶12} In October of 2019, the Agency moved to terminate the Agency's custody and to award custody to the maternal grandmother. In support, the Agency filed a caseworker's affidavit, which states that neither parent has made progress on the case plan goals, and Appellant Father "has not attended the multiple scheduled appointments for paternity testing." (October 21, 2019 Motion to Terminate, October 17, 2019 Affidavit.)

{¶13} The November 2019 case plan states Appellant Mother returned to Ohio in October of 2019. Regarding Appellant Father, the case plan states he has "a history of incarceration due to domestic violence concerns," and he has not contacted the Agency relative to this child welfare case. It also states Appellant Mother wants to work on the case plan toward reunification. However, Appellant Father "lives in Wisconsin and does not wish to receive services. He can contact the agency if he changes his mind." (November 8, 2019 Case Plan.)

{¶14} In February of 2020, the court adopted the Magistrate's Decision granting the Agency's motion to withdraw its motion to terminate its custody of the child and for custody of the child to be granted to her maternal grandmother. The court found the grandmother was no longer able to care for the child because she suffered a stroke and would require extensive rehabilitation as a result. Thus, the Agency's temporary custody of the child was extended. (February 6, 2020 Judgment.)

{¶15} The February 26, 2020 Semi-annual Administrative Review indicates Appellant Mother is now residing in Ohio and working on her case plan goals toward

reunification. However, she had not made progress toward completion and tested positive for cocaine. The child is listed as two years old at the time. (February 26, 2020 Semi-annual Administrative Review.)

**{¶16}** The June 2, 2020 Magistrate's Decision indicates Appellant Mother has continued to go back and forth from Ohio to Wisconsin but wishes to establish residency in Ohio. The decision also states the child was residing in a foster home; Appellant Father was incarcerated out of state; and he attended the hearing by telephone. The Agency's custody of the child was continued. (June 2, 2020 Magistrate's Decision.)

**{¶17}** The Semi-Annual Administrative Review dated August 2020, states in part Appellant Father just recently established paternity, and he contacted the Agency. He was out of prison, but still in Wisconsin. (August 24, 2020 Semi-Annual Administrative Review.)

**{¶18}** Case plan goals for Appellant Father included the completion of mental health and drug/alcohol assessments and following the providers' recommendations. Other goals for Appellant Father included signing releases necessary for the Agency to secure the providers' records or information, his successful completion of parenting classes, and completing random drug testing if deemed necessary via assessment. (September 16, 2020 Amended Case Plan.)

**{¶19}** According to the November 2020 Magistrate's Decision, Appellant Father was released from prison in July of 2020. The Agency advised the court that it was seeking possible placement with Appellant Father via ICPC. (November 5, 2020 Magistrate's Decision.)

**{¶20}** In February of 2021, Appellant Mother moved to modify her visitation with the child and sought visitation at her residence, instead of at the Agency, based on her alleged advancements on her case plan. Appellant Mother later withdrew her motion seeking to modify her visitation with the child, likely based on the Agency's intervening motion for permanent custody. (March 9, 2021 Withdrawal of Motion.)

**{¶21}** In March of 2021, the Agency moved to modify its temporary custody of the minor child to permanent custody. For cause, the Agency contended Appellant Mother had made minimal progress on her case plan objectives, among other issues. Regarding Appellant Father, the Agency asserted he was again incarcerated and had been either

incarcerated or in inpatient substance abuse treatment for the majority of the case. The Agency alleged the child had been in the care of the Agency for more than 12 months out of a consecutive 22-month period. It also alleged that R.C. 2151.414(E) applied to both mother and father, and the child could not be placed with either parent within a reasonable time or should not be placed with either. The Agency likewise asserted the grant of permanent custody to the agency was in the best interest of the child. (March 2, 2021 Motion to Modify.)

**{¶22}** On July 6, 2021, the Agency moved to suspend Appellant Mother's visitation with the child because during mother's June 2021 supervised visit, the child was evidently "not responding" to Appellant Mother, which caused her to terminate the visit early, demand to speak with the foster mother, and during the conversation, Appellant Mother became "upset and escalated and had to be escorted out of the building by the Deputy * * *." The child witnessed the exchange, and was upset as a result, and was "crying, holding her hands over her ears while rocking back and forth saying 'no visit.'" (July 5, 2021 Motion to Suspend Visitation.)

**{¶23}** On March 1, 2022, the magistrate conducted a final pretrial hearing. Appellant Father was present via Zoom and Appellant Mother did not appear. Both were represented by counsel. Also present was the foster mother, who said that Appellant Mother did attend the prior day's visitation with the child. When the magistrate asked about the visit, the foster mother said: "The same as the previous visits. It lasted probably five to eight-ish minutes. [The child] did not speak to her. [The child] just sits as long as I can get her to sit and then she'll run away." (March 1, 2022 Tr. 9-10.)

**{¶24}** The hearing commenced before the magistrate on March 28, 2022 on the Agency's motion for permanent custody. The ongoing caseworker for Mahoning County Children Services at the time, James Higgs, testified. Higgs said the child was four years old at the time of the hearing. The Agency obtained temporary custody of the child on March 6, 2019 when the mother was removed from a local shelter for intoxication. (Tr. 15-23.)

**{¶25}** Higgs also testified to the following. The Agency created an initial case plan in 2019 with a goal of reunification for both parents.

**{¶26}** Higgs explained he attempted to assist Appellant Mother in securing stable housing with referrals and phone numbers for low income housing options. Appellant Mother was living with her own mother for some time during the pendency of the case. She also resided with a boyfriend in New Castle, Pennsylvania and Higgs visited this location but identified several issues that needed rectified to make it suitable for a young child. (Tr. 119-120.) Appellant Mother also moved back and forth to Milwaukee during the case. Higgs described her communications with the Agency as inconsistent and sometimes unreliable. (Tr. 30.) He also said Appellant Mother did not complete the required parenting class that lasts about six weeks until after the Agency moved for permanent custody of the child. (Tr. 33.)

**{¶27}** Appellant Mother had in person visits with E.T., and Higgs felt she was bonded with the child, but the visits were changed to Zoom because of an incident in July of 2021 during which Appellant Mother had an "outburst at the agency and she had to be escorted out. And this all happened in front of the child." (Tr. 50.)

**{¶28}** As for her mental health case goals, Appellant Mother went to the assessment but did not follow the counseling recommendations. She only attended two sessions. (Tr. 27-28.) As for her employment, Higgs described it as "off and on." She worked for a temporary agency earning about $75 per month. (Tr. 29.)

**{¶29}** Regarding Appellant Father, the first case plan had objectives for him to maintain employment and secure stable housing. However, these objectives had to be changed because Appellant was subsequently incarcerated in Wisconsin during the Agency's involvement. The case plan also identified mental health and substance abuse assessment requirements for Appellant Father. According to Higgs, Appellant Father was noncompliant with these objectives. (Tr. 23-37.)

**{¶30}** According to Higgs, Appellant Father was supposed to complete parenting classes but was unable to do so because these classes were not offered at the facility in which he was incarcerated. Appellant Father had been incarcerated for the majority of the time the case was open. He was incarcerated twice during the pendency of the Agency's case. (Tr. 44.) He was "out for a short period of time, the end of 2020." Appellant Father violated probation by assaulting someone, which is why he was incarcerated at the time of trial. Higgs said Appellant Father did not contact the Agency

when he was *not* incarcerated during the pendency of the proceedings.  Higgs contacted Appellant Father about his case plan goals and to identify anyone who would be willing to care for the child.  (Tr. 38-40.)

**{¶31}**  In October of 2020, Appellant Father identified his sister as a person who could care for the child.  Higgs explained that the Agency filed the ICPC request, but Wisconsin issued a denial based on her financial issues.  Higgs also testified the second person Appellant Father identified as a possible placement for the child was not eligible because Wisconsin "does not do ICPC for non-relatives."  The ICPC process was pursued during 2020 and 2021.  (Tr. 41-43.)

**{¶32}**  According to Higgs, Appellant Father visited the child via Zoom, and visitation had been appropriate.  (Tr. 51-52.)  Higgs testified the case plan was changed and updated on July 20, 2021 to accomodate Appellant Father as he was incarcerated.  (Tr. 54.)  Higgs facilitated Appellant Father's Zoom visits with the child and was available to answer his questions before the visits.

**{¶33}**  At one point, the child was placed with her maternal uncle's girlfriend until there was a shooting inside the home when the child was present.  (Tr. 55.)  The child was then placed in foster care.  She has been with the same family since August of 2020.  Higgs described the child as thriving there and said he has no concerns with her current placement, but indicated the child has been diagnosed with post-traumatic stress disorder.   The child refers to her foster parents as mom and dad and has bonded with their other children.  The foster parents are identified as prospective adoptive parents.  (Tr. 56-60, 68.)

**{¶34}**  According to Higgs, he informed Appellant Father the Agency was seeking permanent custody of the child in March of 2021, and in response, Appellant Father gave the Agency the name of another candidate, a paternal cousin, for ICPC in May of 2021.  Higgs began the process with this new individual until he was advised by the Agency attorney to stop the process because two years had passed since the Agency had custody of the child, and it had already moved for permanent custody.  (Tr. 79.)  Thereafter, Higgs re-initiated the ICPC process in July or August of 2021 for this third individual, and the process was ongoing at the time of the final hearing.  (Tr. 62-64; 78-79.)  Appellant also

identified a fourth possible ICPC candidate, his fiancé, two weeks before trial. (Tr. 89-91.)

{¶35} The Agency had been involved with this case for approximately three years at the time of the hearing. Higgs said Appellant Father did not participate in the case or visit the child except when he was incarcerated. (Tr. 65.)

{¶36} The Wisconsin facility informed Higgs it did not have parenting classes available. (Tr. 74.) Higgs interacted with Appellant Father every Monday via Zoom when he had visits with the child. (Tr. 74-75.) On cross-examination, Higgs acknowledged he did not know how to assist Appellant Father to secure the recommended mental health and substance assessments while he was incarcerated out of state. (Tr. 72.) Higgs was new to the Agency at the time and agreed he should have asked his supervisor for assistance.

{¶37} Appellant Mother since had another child, E.T.'s sibling, and as of the time of the permanent custody hearing regarding E.T., this child was residing with the same foster family as E.T.

{¶38} In March of 2021, the Agency's case plan goal changed from reunification to the Agency seeking permanent custody. Higgs informed Appellant Mother. (Tr. 112.) The motion for permanent custody was also mailed to both parents. (Tr. 116.) Higgs said Appellant Father did not actively participate in the case until about the time when the Agency moved for permanent custody of E.T. (Tr. 121-122.)

{¶39} The foster mother, N.T., testified. She explained she is a homemaker who has three biological children and cares for E.T. and her baby sister. N.T. and her husband have had custody of E.T. since she was one year old. (Tr. 139-142.) E.T. left their care twice for two possible kinship placements that were unsuccessful. They have had E.T. for a total of 587 days.

{¶40} N.T. recalled Appellant Father began visiting the child via Zoom in December of 2021. (Tr. 144.) He has had nine scheduled videoconference visits with E.T. and has missed three of them. Each visit lasted no more than ten minutes. N.T. said the child cried after the visits. E.T. would run from the screen and refuse to participate. N.T. has not perceived a bond between Appellant and the child. N.T. said "she does not know who he is. And she cries when it's time for her to sit down for her

visit." (Tr. 147-151.)  The child does not speak during the visits "except to ask if she can be done." (Tr. 157.)

**{¶41}** N.T. described a normal day for the child and how the child has bonded with her, her husband, her other children, and their extended family members.  N.T. said if the Agency were granted permanent custody of E.T., then she and her husband want to adopt her.  (Tr. 154.)

**{¶42}** Appellant Father's first cousin, S.J., also testified.  S.J. met E.T. twice when she was an infant.  S.J. said she was contacted in December of 2021 to begin the ICPC process and Children Services visited her home in January of 2022.  She said she had a few Zoom meetings with the ICPC representatives, who will conduct a second home visit before she can complete the requisite paperwork.  And that, according to S.J., should be the end of the ICPC process.  S.J. denied having any substance abuse or mental health issues.  She also denied any disabilities which would prevent her from raising a child.  She is employed at a child care facility and has three children.  Her other children are 18, 16, and 13 years old.  S.J. said her husband does not have a criminal record, and he is also employed.  She said she was willing to take custody of the child.  S.J. was first contacted by Higgs in May.  She was told the process had been stopped.  S.J. thought the process would take about 90 days total.  The second home visit was not yet scheduled at the time of the March 28, 2022 hearing.  (Tr. 161-173.)

**{¶43}** Appellant Father testified.  At the time of trial, he was incarcerated in Milwaukee.  He was set to be released in 123 days on July 30, 2022.  He explained he wanted the trial to be rescheduled until after he was released, but his motion to continue was overruled.  He thought it is reasonable for the court to wait.  He testified he has two other children, and he is engaged to be married to a woman who is not the mother of his children.  There was no other testimony or evidence about Appellant Father's other children.  Appellant Father said he plans to live with his fiancé when he is released.  He denied having any mental health or substance abuse problems.  He also testified he has never been accused or convicted of committing a crime against a child.  (Tr. 177-181.)

**{¶44}** Appellant Father recalled the ICPC process with Higgs.  Appellant Father said he identified his cousin S.J. for placement of the child after his sister was denied.  He did not remember specific dates, but remembered telling Higgs about S.J. in May of 2021.

(Tr.183-185.) Appellant Father explained he wanted his cousin to care for the child until he was able to "get back on his feet." (Tr. 186.)

{¶45} At the time of the trial, Appellant Father had been incarcerated for approximately 14 months. Before that time, he was in a residential treatment facility, and prior to that he was also "locked up." He was incarcerated the first time for disorderly conduct, and the second time for a probation violation. He was arrested in connection with a fight at a hospital, but said this charge was dismissed. (Tr. 189-199.) He agreed he has been essentially "locked up" for the duration of the Agency's involvement with the child except for a period of about nine months. During that nine-month period, he did not know where the child was living. He said he used Google and Facebook to find her mother, but was unsuccessful. Contrary to the Agency's argument, he said he first learned the child was in the Agency's custody in November of 2020. (Tr. 188-196.)

{¶46} The last witness to testify was the guardian ad litem (GAL) Attorney Solmen. He last updated his report in this case on January 19, 2022. Based on his review of the case and his investigation, the GAL recommended custody of the child be granted to the Agency. This recommendation is based on the best interest of the child. (Tr. 206.).

{¶47} The GAL's reports include the following. The GAL was appointed March 7, 2019 when the infant was removed from her mother's custody by police. Mother had been intoxicated and removed from her public shelter housing and had nowhere to live. The initial report also indicates the child suffered from PTSD and night terrors. The GAL observed the child, interviewed her foster parents, and reviewed her counseling records. The child was too young to interview. The child has changed locations "at least four times" since the Agency's involvement, but the GAL noted she "is very bonded with the foster parents, especially" the foster mother.

{¶48} The first GAL report identified Appellant Father as the putative father for the child born in November of 2017. The report states father "never responded to my requests for an interview, and has done nothing on his Case Plan." It also states he was incarcerated, and the child is "not familiar with any of her relatives in Wisconsin." The GAL concluded the Agency has had uninterrupted temporary custody of the child for 21 consecutive months.

{¶49} The GAL explained that Appellant Mother made progress on her case plan, but "fell short of any meaningful progress despite the amount of time given her." He emphasized that she failed to complete the recommended follow up from her mental health and alcohol assessments twice. He also stressed Appellant Mother's lack of consistent and stable housing, noting she moved five times during the case. Regarding income, although she has been employed intermittently, he said she did not earn enough to meet the child's basic needs. Her income for 2020 was less than $900, and for 2021, it was less than $200. The GAL recommended granting the Agency permanent custody. (April 2021 GAL Report.)

{¶50} In the GAL's updated report, he said he again visited the child in her foster care setting and noted she showed "marked improvement." This updated report also states that placement with Appellant Father was not feasible because he was incarcerated in Wisconsin, but he submitted a name for ICPC referral. The GAL then noted he spoke with Appellant Father on January 14, 2022, and he said he has a placement option for the child with his cousin. The GAL indicated the Agency "dragged its feet" in pursuing this ICPC referral. (January 2022 Updated GAL Report.)

{¶51} As an update to his recommendations, the GAL continued to recommend permanent custody be granted to the Agency. Regarding Appellant Father, the GAL noted Appellant had done "nothing to work his Case Plan prior to his incarceration." The GAL also said he was "advised that it would take a full year to complete placement with [Appellant's cousin] assuming everything were to go without a hitch. ICPC placement at this point," would not be in the child's best interest. The GAL concluded that ICPC placement at this juncture would be "unfair and damaging to her. Presently assuming that the ICPC process was further along, per [Appellant's] argument, it would not affect my recommendation concerning the subject child's best interests * * *." (January 2022 Updated GAL Report.)

{¶52} Appellant Father and Appellant Mother objected to the Magistrate's Decision, which the trial court overruled via its 24-page October 20, 2022 judgment.

{¶53} Appellant Mother and Appellant Father each appealed. We address their assigned errors separately.

<u>Appellant Father's Assignments of Error</u>

**{¶54}** Appellant Father's first of three assignments of error asserts:

"The Juvenile Court committed reversible error and abused its discretion when it granted the MCCS' motion for permanent custody despite the agency not following the mandates of ORC 5103.20 (Interstate Compact for Placement of Children Adopted) ('ICPC')."

**{¶55}** A parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14; *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (1991). Based on these principles, the Ohio Supreme Court has determined a parent "must be afforded every procedural and substantive protection the law allows." (Citation omitted.) *Hayes* at 49, 679 N.E.2d 680.

**{¶56}** However, the "interest of parents is not absolute." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. When the state properly invokes its statutory power to terminate parental rights, it is constitutional to remove children from their parents' care when necessary for the welfare of the child. *Id.*

**{¶57}** Appellant Father broadly contends certain procedures or statutes were not followed in this case. However, Appellant Father does not direct our attention to legal authority showing what the Agency's obligations were, if any, when presented with his successive requests for interstate placement of the child during the pendency of the child's dependency proceedings. It is an appellant's burden to affirmatively demonstrate error on appeal. *Kremer v. Cox*, 114 Ohio App.3d 41, 60, 682 N.E.2d 1006 (9th Dist.1996).

**{¶58}** Although it is not the function of the court of appeals to root out law in support of an argument, App.R. 16(A)(7), our review of the law has not identified provisions governing Appellant Father's multiple ICPC requests when an Agency's motion for permanent custody is pending. Regardless, when the Agency was presented with Appellant Father's successive requests for out of state placement of the child, the Agency contacted the authorities in Wisconsin in an effort to ascertain each person's eligibility.

**{¶59}** Appellant Father's sister was deemed not eligible by Wisconsin based on her lack of financial stability. The second person Appellant Father identified as a candidate was rejected since she was not a blood relative. The third person Appellant Father identified, his cousin, was still being processed by Wisconsin to determine eligibility at the time of the final hearing. At one point, the Agency also sought ICPC placement with Appellant Father and Appellant Mother, and this requested placement was denied by Milwaukee County as well.

**{¶60}** Assuming the Agency was required to attempt to secure out of state placement for the child when presented with a parent's multiple requests, the Agency reasonably responded here and contacted the authorities in Wisconsin. However, the identified individuals were not deemed viable candidates for placement. And as for Appellant Father's cousin, S.G., she was identified in May of 2021—after the Agency had already moved for permanent custody. In light of the Agency's pending motion for permanent custody, its hesitation in pursuing this ICPC placement was understandable. Pursuant to R.C. 2151.413(D)(1), at that juncture the state was required to file a motion requesting permanent custody of the child, which it filed on March 2, 2021.

**{¶61}** Because Appellant Father failed to identify any law or rule the Agency failed to satisfy, this assignment of error lacks merit.

<u>Appellant Father's second assignment of error</u>

"The Juvenile Court committed reversible error and abused its discretion in granting MCCS' motion for permanent custody of the minor child E.T. nka E.W.-T. for at the time of the final hearing, the natural father was still pursuing reunification and/or 'ICPC' placement with a relative and the decision was thus not based on clear and convincing evidence and/or was against the manifest weight of evidence and/or implicates plain error."

**{¶62}** We "will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re J.S.E.,* 11th Dist. Portage Nos. 2009-P-0091, 2009-P-0094,

2010-Ohio-2412, ¶ 25; *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001).[2]

**{¶63}** The clear and convincing evidence standard requires the evidence "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

> Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof. * * * The determination of the [trial] court should not be overturned unless it is unsupported by clear and convincing evidence.

*Id.* "Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *Matter of D.H.*, 11th Dist. Ashtabula No. 2017-A-0081, 2018-Ohio-630, ¶18, quoting *In re West,* 4th Dist. Athens No. 05CA4, 2005-Ohio-2977, ¶ 37.

**{¶64}** Before a juvenile court can terminate parental rights and award permanent custody to the requesting Agency, it must conduct a hearing and apply a two-pronged analysis. First, a court must find by clear and convincing evidence that one or more of the factors in R.C. 2151.414(B)(1)(a)-(e) applies. These factors include whether the child has been in the Agency's custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

**{¶65}** Second, upon finding one or more of these factors applies, the trial court after a hearing, shall determine whether granting custody of the child to the Agency is in the child's best interest pursuant to the analysis in R.C. 2151.414(D).

**{¶66}** Here, the Agency moved for permanent custody under the 12 out of the 22-month prong in R.C. 2151.414(B)(1)(d). The trial court agreed and made findings in

---

[2] The Eleventh District Court of Appeals *In the Matter of Z.C.*, 11th Dist. No. 2022-A-0014, 2022-Ohio-3199, 195 N.E.3d 590, has recently certified a conflict on the governing standard of review in termination of parental rights cases, and the matter was pending before the Ohio Supreme Court in Case Number 2022-1251 at the time of this decision.

support. Neither party challenges this aspect of the trial court's decision.  Nevertheless, the record supports this aspect of the court's decision.

> For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after removal of the child from home.

**{¶67}** As stated, the child was removed from her mother on March 6, 2019.  Sixty days after March 6, 2019 is May 5, 2019.  Thus, when the Agency filed its motion for permanent custody on March 2, 2021, the child had been in its custody for more than one year and nine months.

**{¶68}** As for the second prong, the court must find by clear and convincing evidence that granting permanent custody of the child to the Agency was in the best interest of the child upon considering all relevant factors including those in R.C. 2151.414(D).  The trial court conducted this analysis and concluded a grant of permanent custody to the Agency was in the child's best interest.  (October 20, 2020 Judgment.)

**{¶69}** Appellant Father's initial argument in this assignment of error reiterates his argument in his first assignment.  He again claims the Agency should have exhausted his multiple requests for out of state placement of the child and the Agency failed to satisfy unspecified requirements in the ICPC.  As stated, however, Appellant Father fails to identify governing statutes or requirements which the Agency failed to satisfy, and thus, this argument lacks merit.

**{¶70}** The remainder of Appellant Father's second assigned error challenges the trial court's best interest determination—he contends the court's decision is not supported by the evidence.  Instead, he claims it should have delayed the final hearing until he was released from prison to allow him to complete his reunification goals and case plan, and this would have allowed his cousin to complete the ICPC process.  In light of these facts, he claims the court's decision was hurried and contrary to the child's best interests.  We disagree.

**{¶71}** As stated, the court must find by clear and convincing evidence that granting permanent custody of the child to the agency is in the best interest of the child upon considering all relevant factors, including those in R.C. 2151.414(D)(1), which states:

In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶72} The child has been in the custody of the Agency since March of 2019, when she was a little more than one year old. She was deemed a dependent in July of that year. As of the date of this opinion, she is about five years old, and she has not lived with either parent for eighty percent of her life. Appellant Father's argument that the child's permanent placement should be delayed until after he is released in 123 days does not offer permanency. His argument is contingent on his approval via the ICPC process by the state of Wisconsin and suggests the Agency temporarily place the child with his cousin, who has only met the child twice when she was an infant. The child needs permanency and consistency of care, not further delay and upheaval. Moreover,

Case Nos. 22 MA 0116, 22 MA 0133

Appellant Father's argument and participation in the case does not demonstrate he can provide the type of secure and permanent care the child needs.

**{¶73}** Appellant Father was repeatedly incarcerated during the pendency of the case and for the majority of the time the case was pending. During the limited time he was not incarcerated during the case, Appellant Father was not in contact with the Agency, and he did not participate in the case plan.

**{¶74}** As for Appellant Father's testimony that he was *not* aware of the pendency of this case until November of 2020, the court found his testimony was contrived and lacking credibility. To the contrary, the court noted the initial Agency caseworkers were in contact with him about the child and the pendency of the case in July of 2019, but he declined to participate. (October 20, 2020 Judgment.)

**{¶75}** Appellant Father only began actively participating in the case when he was incarcerated. Further, the court found he could not provide the necessary and appropriate care the child needed. His arguments fail to account for the negative impact his proposed delay would have on the child's well-being if the court's decision regarding the Agency's motion for permanent custody were denied or delayed.

**{¶76}** As for the child's interactions with the family, the child has been with the same foster family since August of 2020, where the child is thriving and meeting her developmental milestones. The child is well bonded with her foster parents, especially the foster mother. The child suffers from PTSD and is being treated. The child also appears very bonded with the other children in the home and attends pre-kindergarten. The foster parents intend to seek to adopt her if the Agency is granted permanent custody. At the time of the hearing, the foster parents also had temporary custody of the child's younger sister.

**{¶77}** The child's foster mother described the child's behavior during the Zoom visits with her father as not reflecting a parent-child bond or relationship. The child is afraid and cries before and during the weekly visits. She often runs away from the screen and refuses to come back and participate. The foster mother also testified Appellant Father has missed certain visits, and during one, he made a comment to the child, which she thought was inappropriate.

{¶78} Although counsel cross-examined Higgs about whether he used his best efforts to secure the necessary services for Appellant Father, who was incarcerated in Wisconsin, there was no corresponding evidence showing Appellant Father attempted to secure the recommended services via his own efforts.

{¶79} Appellant Father identified four individuals for the child's possible ICPC placement. The third candidate he identified was his paternal cousin. He did not identify her until after the child was in the Agency's custody for more than two years, and it had already moved for permanent custody. Another name Appellant Father gave to the caseworker was deemed not a suitable candidate, and another was not a relative and thus ineligible. Appellant Father also identified his fiancé as a possible candidate two weeks before the final hearing. Regarding Appellant Father's cousin, whose eligibility had yet to be determined at trial, the trial court emphasized that Appellant Father proposed her only as a temporary candidate who could care for the child until he was released from prison.

{¶80} Although Appellant Father's participation and interactions have been mostly consistent since his incarceration, his participation in the case plan and efforts before he was in prison were lacking, despite being notified the child was in the Agency's custody.

{¶81} The focus of the test is the best interest of the child. Here, the child's need for permanency and stability will be furthered by the grant of custody to the Agency and her continued placement with the foster family, where she is thriving in all areas, and who intend to seek to adopt her once the Agency is granted custody. The evidence shows a lack of relationship with Appellant Father and a strained relationship with Appellant Mother, which had not been remedied during the case. Upon considering all relevant factors, we find the trial court's judgment granting permanent custody of the child to the agency is in the best interest of the child and is supported by clear and convincing evidence.

{¶82} Thus, Appellant Father's second assignment lacks merit.

<u>Appellant Father's third assignment of error</u>

"The Juvenile Court committed reversible error and abused its discretion when it denied natural father's motions for continuance prior to trial, so that new counsel could be prepared for trial, and so he could pursue reunification upon his release from

<u>Case Nos. 22 MA 0116, 22 MA 0133</u>

incarceration and participate in case plan programs and/or allow the ICPC process to complete."

**{¶83}** Appellant Father argues the court should have delayed the proceedings for him to complete his reunification goals until he was released from prison, in approximately 123 days. He contends the decisions denying his requests constitute an abuse of discretion because the court disregarded his parental rights and rushed the proceedings. He also claims the court overlooked his cousin as a potential out-of-state placement option for the child during the few months before he will be released.

**{¶84}** A parent must be afforded every procedural and substantive protection that the law allows before parental rights may be terminated. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Due process includes a hearing with adequate notice; the assistance of counsel; and under most circumstances, the right to be present at the hearing. *In re M.W.*, 10th Dist. Franklin No. 07AP-529, 2007-Ohio-6506, ¶ 79.

**{¶85}** When addressing the denial of a continuance, appellate courts employ an abuse of discretion standard. *State v. Unger,* 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus. An abuse of discretion connotes judgment exercised by a court that does not comport with reason or the record. *State v. Underwood,* 11th Dist. No.2008-L-113, 2009-Ohio-2089, ¶ 30, citing *State v. Ferranto,* 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925).

**{¶86}** "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Unger* at 67, 423 N.E.2d 1078, quoting *Unger v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841 (1964).

> Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.

> In evaluating a motion for a continuance, a court should note, *inter alia:* the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether

the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

(Citation omitted.) *Unger,* 67 Ohio St.2d 65, 67-68, 423 N.E.2d 1078.

**{¶87}** Appellate courts must examine the "*Unger* facts" in each case and upon balancing these factors, determine whether the trial court abused its discretion in denying a continuance. *In re Kutcher,* 7th Dist. Belmont No. 02BE58, 2003-Ohio-1235, ¶ 26.

**{¶88}** Appellant Father was appointed new counsel, who filed his first motion to continue on February 7, 2022 to move the trial from that same date. Contrary to Appellant Father's argument, however, this motion was granted, and the final hearing was rescheduled until March 28, 2022. (February 18, 2022 Magistrate's Order.)

**{¶89}** As for Appellant Father's second motion to continue, his attorney moved to continue the March 28, 2022 permanent custody hearing on March 15, 2022. He alleged the court should delay the proceeding and its decision on permanent custody of the child until after father's release from prison on July 30, 2022. Appellant Father claimed the child could be placed with him within a reasonable time after his release. His argument here is akin to that in his second assigned error. This motion to continue was contingent and based on his proposed release from prison and argued, in the interim, the child could reside with his cousin S.J. in Wisconsin. (March 15, 2022 Motion to Continue.)

**{¶90}** While Appellant Father testified his scheduled release date was several months after the final hearing, the child had been in the Agency's custody for more than four years and 80 percent of her life at the time of the hearing. And as stated, Appellant Father's motion was based on contingencies that had yet to reach fruition, i.e., his release from prison and his cousin's ICPC approval for placement of the child.

**{¶91}** Upon considering the applicable *Unger* facts, we find no abuse of discretion. Appellant Father was incarcerated based on his conduct, and the child's permanency needs should not be further delayed as a result. Moreover, his motion was wholly contingent on his release from prison, which had yet to occur and could have been further delayed for various reasons. Even assuming Appellant Father was released on that date, in the life of a child, the proposed additional four to six-month delay is substantial. Thus, the length of the requested delay supports the court's decision.

{¶92} Also relevant is Appellant Father's lack of participation in the case plan and proceedings before his incarceration. Appellant Father resided at the same address during the initial stages of the case, and he was contacted by Agency caseworkers, but did not to participate in the case. He missed several paternity tests in Wisconsin. He likewise did not to return to Ohio to establish paternity, visit the child, or seek custody during the period of time he was not incarcerated. Moreover, the trial court found his testimony about his lack of notice of the proceeding lacking in credibility. *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984) ("the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.")

{¶93} Based on the foregoing, we find no abuse of discretion and overrule Appellant Father's third assignment of error.

<u>Appellant Mother's Assignments of Error</u>

{¶94} Appellant Mother's first assignment of error asserts:

"The Trial Court incorrectly found that the Minor Child could not be placed with Appellant within a reasonable time."

{¶95} Appellant Mother argues she substantially remedied the issues that caused the child's removal from her custody. She claims the Agency failed to establish she did not have adequate housing and that she had continuing substance abuse problems, and as such, the child should have been returned to her custody. We disagree.

{¶96} As detailed under Appellant Father's assigned errors, a juvenile court addressing a motion to terminate parental rights must conduct a hearing and apply a two-pronged analysis. First, a court must find by clear and convincing evidence that one or more of the factors in R.C. 2151.414(B)(1)(a)-(e) applies. These factors include whether the child has been in the Agency's custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

{¶97} Second, upon finding one or more of these factors applies, the trial court shall determine whether granting custody of the child to the Agency is in the child's best interest pursuant to the analysis in R.C. 2151.414(D).

**{¶98}** Appellant Mother's first assignment of error challenges the trial court's decision under the first prong. She claims the court's determination the child could not or should not be placed with her within a reasonable time is erroneous and contrary to the evidence.

**{¶99}** As for the first prong of the test, the Agency moved for permanent custody of E.T. on two alternative arguments. First, it alleged the child had been in its custody for a consecutive 12-month period during the 22 months preceding its motion for permanent custody. Additionally, the Agency alleged the child could not or should not be placed with either parent within a reasonable time. (March 2, 2021 Motion to Modify.)

**{¶100}** As stated under Appellant Father's second assignment of error, neither parent challenged the court's finding E.T. had been in the Agency's custody for 12 out of a consecutive 22-month period. Because the first prong is established, we need not address the Agency's other ground and the trial court's alternative finding that the child could not or should not be placed with Appellant Mother within a reasonable time. R.C. 2151.414(E).

**{¶101}** Notwithstanding, the trial court found:

"[f]ollowing the placement of the Minor Child outside of the Minor Child's home, and notwithstanding reasonable case planning and diligent efforts by the Agency to assist Mother, she did not remedy the primary problems that initially caused the Minor Child to be placed outside her home. The Court finds that Mother has failed continuously, and repeatedly, to substantially remedy these conditions."

(October 20, 2022 Judgment.) In support of this finding, the court found Appellant Mother did not complete her mental health recommended services and did not remedy her housing issues. She also failed to cooperate with the Agency to verify her employment. (October 20, 2022 Judgment.)

**{¶102}** Consistent with the court's findings and contrary to Appellant Mother's argument, the evidence presented at the hearing showed she did not continue or complete the recommended counseling services from two separate assessments. The evidence also established she did not have a consistent income and could not provide for the child's basic needs. Moreover, Appellant Mother failed to establish she had a stable

residence or a home suitable for a young child. There was also testimony that Appellant Mother did not have a consistent means of communication. And although she completed the parenting classes, the classes were recommended in 2019, and she did not complete the six-week class until February of 2022.

{¶103} Based on the foregoing, the trial court's determination that the child could not or should not be placed with her within a reasonable time is supported by clear and convincing evidence. Despite the Agency's efforts and its lengthy temporary custody of the child, Appellant Mother did not remedy the problems that initially caused E.T.'s removal. Appellant Mother's first assignment of error is overruled.

<u>Appellant Mother's second assignment of error</u>

"The Trial Court never addressed the required R.C. 2151.414(D) Best Interest Factors in this case."

{¶104} As stated, the second required prong in the permanent custody analysis is whether a grant of permanent custody to the Agency is in the child's best interests. An agency seeking permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. When addressing this second prong of the test, R.C. 2151.414(D)(1) sets forth the court's obligation as:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the *court shall consider all relevant factors, including, but not limited to, the following*:
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive

Case Nos. 22 MA 0116, 22 MA 0133

twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

(Emphasis added.)

**{¶105}** Although the statute requires the trial court to consider the best interest of the child, including the statutory factors and all relevant factors, there is no requirement that the court enunciate its consideration of each factor or detail its findings corresponding with each. *In re A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. A reviewing court, however, must be able to discern the trial court considered the factors. *Id.*

**{¶106}** Our review shows the trial court considered and weighed the relevant factors as required under R.C. 2151.414(D). *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56-66.

**{¶107}** The court found while Appellant Mother was making some effort on her case plan goals, the child had been in the Agency's care since she was one year old. And despite the duration of the Agency's involvement, neither parent was able to provide the permanent and stable environment the child needed. The trial court noted testimony about visitation showed the child had a strained relationship with her mother and almost no relationship with her father. On the other hand, the child was thriving in foster care, where E.T.'s younger sister was also placed. E.T. was described as having a strong bond with her foster parents, siblings, and their relatives. Further, the foster mother testified she intended to seek to adopt E.T. if the Agency prevailed on its motion. R.C. 2151.414(D)(1).

**{¶108}** Accordingly, Appellant Mother's contention the trial court did not address the required R.C. 2151.414(D) best interest factors lacks merit. The trial court's decision finding an assignment of permanent custody of E.T. to the Agency was in her best interests is supported by clear and convincing evidence.

## Conclusion

**{¶109}** Based on the foregoing, Appellant Father's and Appellant Mother's assignments of error lack merit and are overruled. The trial court's decision granting permanent custody of E.T. to the Agency is affirmed.

Waite, J., concurs.

D'Apolito, P. J., concurs.

Case Nos. 22 MA 0116, 22 MA 0133

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Mahoning County Court of Common Pleas, Juvenile Court Division of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**